Ernest HUIZAR, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of
the Social Security Administration,
Defendant.

Civil Action No. SA–08–CA–103–XR.

United States District Court,
W.D. Texas,
San Antonio Division.

June 29, 2009.

**616**

Margaret M. Maisel, Tinsman & Sciano, Inc., San Antonio, TX, for Plaintiff.

Joseph Cuauhtemoc Rodriguez, Assistant United States Attorney, San Antonio, TX, for Defendant.

### ORDER

XAVIER RODRIGUEZ, District Judge.

On this date, the Court considered the Report and Recommendation filed by the Magistrate Judge, and Plaintiff's objections thereto, concerning Plaintiff's appeal of the Commissioner's decision to deny him Social Security disability benefits. Where the Report and Recommendation has been objected to, the Court reviews the Magistrate Judge's recommended disposition *de novo* pursuant to Federal Rule of Civil Procedure 72 and 28 U.S.C. § 636(b)(1). After careful consideration, the Court accepts the Magistrate Judge's recommendation to reverse and remand for further proceedings.

### *Introduction*

On May 18, 2005, Plaintiff filed a Title II application for disability insurance benefits.[1] Plaintiff also filed a Title XVI application for supplemental security income on May 18, 2005.[2] On August 17, 2007, the Administrative Law Judge (ALJ) denied Plaintiff's claims for disability insurance benefits and supplemental security income at step five, finding that Plaintiff could work the jobs of night watchman, security guard, gate guard, and school bus monitor, available in significant numbers throughout the national economy.[3] Plaintiff appealed, arguing that the ALJ erred by: (1) not following the procedure for considering vocational expert (VE) testimony set forth by SSR 00–4p; (2) considering part-time work (school bus monitor job) in deciding whether Plaintiff could perform other work significantly available in the national economy; and (3) not ordering a consultative psychological examination.[4] The Magistrate Judge recommended reversal and remand of the ALJ's denial of Plaintiff's application for disability insurance benefits and supplemental security income. Under Plaintiff's first and second objections, the Magistrate Judge agreed the ALJ did not comply with SSR 00–4p in regards to the night watchman, security guard, and gate guard jobs but stated that the ALJ did not

1. Tr. at 23.

2. *Id.*

3. *Id.* at 29–30.

4. *Id.* at 5, 10–11.

err in considering the school bus monitor job.[5] The Magistrate Judge also recommended that the ALJ should consider the necessity of a consultative psychological examination on remand.[6] The Commissioner objects to the Magistrate Judge's recommendation to remand on the grounds that the school bus monitor job exists in significant numbers in the national economy such that remand to correct any errors identified by the Magistrate Judge would be unnecessary.[7] Plaintiff responds that, because the ALJ's "significant number" decision was based on a finding that Plaintiff could work any of four different jobs (night watchman, security guard, gate guard, and school bus monitor), any decision by the Court regarding whether the school bus monitor job alone satisfies the "significant number" standard would constitute an improper post hoc rationalization for affirming the decision of the Commissioner.[8] Plaintiff further argues that the Court should reject the Magistrate Judge's recommendation that Plaintiff could work as a school bus monitor.[9]

## Jurisdiction

This Court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. § 405(g).[10]

## Administrative Proceedings

This is an action to review a decision of the Commissioner of the Social Security Administration. Plaintiff originally filed applications for disability insurance benefits and supplemental security benefits on May 18, 2005, alleging disability since May 30, 2003.[11] The claims were denied initially on August 10, 2005 and upon reconsideration on December 2, 2005.[12] Plaintiff then filed a written request for a hearing on December 15, 2005.[13] On June 20, 2007, Plaintiff appeared and testified in front of the ALJ at a hearing in San Antonio, Texas.[14] The ALJ denied disability benefits to the Plaintiff on August 17.[15] On December 11, 2007, the Appeals Council concluded no basis existed to grant review of the ALJ's decision.[16] Plaintiff appealed the Appeals Council's decision, and the Magistrate Judge issued a Report and Recommendation on August 13, 2008.[17] The Commissioner objected to the Report and Recommendation, and Plaintiff filed a response to the Commissioner's objections.[18]

## Analysis

### A. Standard of Review

In reviewing the Commissioner's decision denying disability benefits, the reviewing court is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence.[19] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept

5. Docket # 21 at 35.

6. *Id.*

7. Docket # 23 at 5.

8. Docket # 24 at 2–3.

9. *Id.* at 4–5.

10. 42 U.S.C. § 405(g).

11. Tr. at 23.

12. *Id.*

13. *Id.*

14. *Id.*

15. *Id.* at 31.

16. *Id.* at 4.

17. Docket # 21 at 1.

18. Docket # 23 at 1; Docket # 24 at 1.

19. *Martinez v. Chater,* 64 F.3d 172, 173 (5th Cir.1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

as adequate to support a conclusion."[20] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.' "[21]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[22] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[23] Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve.[24] Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[25]

### 1. Entitlement to Benefits

Every individual who is insured for disability benefits, has not reached retirement age, meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive disability insurance benefits.[26] Every individual who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive supplemental security income benefits.[27] The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[28] A claimant shall be determined to be disabled only if her physical or mental impairment or impairments are so severe that she is unable to not only do her previous work, but cannot, considering her age, education, and work experience, participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if she applied for work.[29]

### 2. Evaluation Process and Burden of Proof

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[30] A finding that a claimant is disabled or not disabled at any point in the

**20.** *Villa v. Sullivan,* 895 F.2d 1019, 1021–22 (5th Cir.1990) (quoting *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir.1983)).

**21.** *Abshire v. Bowen,* 848 F.2d 638, 640 (5th Cir.1988) (quoting *Hames,* 707 F.2d at 164).

**22.** *Martinez,* 64 F.3d at 173.

**23.** *Ripley v. Chater,* 67 F.3d 552, 555 (5th Cir.1995); *see also Villa,* 895 F.2d at 1021 (the court is not to re-weigh the evidence, try the issues *de novo,* or substitute its judgment for that of the Commissioner).

**24.** *Martinez,* 64 F.3d at 174.

**25.** *Id.*

**26.** 42 U.S.C. § 423(a)(1).

**27.** 42 U.S.C. § 1382(a)(1) & (2).

**28.** 42 U.S.C. § 1382c(a)(3)(A).

**29.** 42 U.S.C. § 1382c(a)(3)(B).

**30.** 20 C.F.R. §§ 404.1520 and 416.920.

process is conclusive and terminates the Commissioner's analysis.[31]

The first step involves determining whether the claimant is currently engaged in substantial gainful activity.[32] If so, the claimant will be found not disabled regardless of her medical condition or her age, education, or work experience.[33] The second step involves determining whether the claimant's impairment is severe.[34] If it is not severe, the claimant is deemed not disabled.[35] In the third step, the Commissioner compares the severe impairment with those on a list of specific impairments.[36] If it meets or equals a listed impairment, the claimant is deemed disabled without considering his or her age, education, or work experience.[37] If the impairment is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional capacity (RFC) and the demands of her past work.[38] If the claimant is still able to do her past work, the claimant is not disabled.[39] If the claimant cannot perform her past work, the Commissioner moves to the fifth and final step of evaluating the claimant's ability, given her residual capacities, age, education, and work experience, to do other work.[40] If the claimant cannot do other work, she will be found disabled. The claimant bears the burden of proof at the first four steps of the sequential analysis.[41] Once the claimant has shown that she is unable to perform her previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform, but also, taking into account her exertional and nonexertional limitations, able to maintain for a significant period of time.[42] If the Commissioner adequately points to potential alternative employment, the burden shifts back to the claimant to prove that she is unable to perform the alternative work.[43]

## B. Findings and Conclusions of the ALJ

In the instant case, the ALJ reached his decision at step five of the evaluation process. At step one, the ALJ found Plaintiff had not engaged in substantial gainful employment since the alleged onset date, May 30, 2005.[44] At step two, the ALJ found Plaintiff had the medically determinable impairment of right hand ulnar nerve palsy, a "severe" impairment within the meaning of the Regulations.[45] The ALJ also considered Plaintiff's alleged impairments of diminished mental capacity, illiteracy, and depression, but found these alleged impairments to be "non-severe." [46]

---

**31.** *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir.1995).

**32.** 20 C.F.R. §§ 404.1520 and 416.920.

**33.** *Id.*

**34.** *Id.*

**35.** *Id.*

**36.** *Id.*

**37.** *Id.*

**38.** *Id.*

**39.** *Id.*

**40.** *Id.*

**41.** *Leggett,* 67 F.3d at 564.

**42.** *Watson v. Barnhart,* 288 F.3d 212, 217 (5th Cir.2002).

**43.** *Anderson v. Sullivan,* 887 F.2d 630, 632–33 (5th Cir.1989).

**44.** Tr. at 25.

**45.** *Id.* at 25A (citing 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler,* 752 F.2d 1099 (5th Cir.1985)).

**46.** *Id.* at 26.

At step three, the ALJ found the Plaintiff's impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.[47] At step four, the ALJ concluded that Plaintiff is unable to perform past relevant work but has the RFC to perform unskilled light exertion work.[48] The ALJ determined the Plaintiff had full use of the left upper extremity but was limited to using his right arm as a helper hand, although he retained the capacity to sign his name with the right upper extremity.[49] At step five, the ALJ, relying on VE testimony, concluded that Plaintiff had the requisite RFC to perform other work found in significant numbers in the economy and therefore was not "disabled" as defined in the Social Security Act.[50] Specifically, the ALJ found Plaintiff could work as a night watchman, security guard, gate guard, and/or school bus monitor.[51]

## C. Recommendation of the Magistrate Judge

On appeal to this Court, Plaintiff raised three objections to the ALJ's decision: (1) the ALJ erred by not following the procedure for considering VE testimony set forth by SSR 00–4p; (2) the ALJ erred in considering whether Plaintiff could work as a school bus monitor because school bus monitor positions are only available on a part-time basis; and (3) the ALJ erred in not ordering a consultative psychological examination.[52] Plaintiff also requested that the ALJ be instructed on remand to consider a report reflecting a recent psychological evaluation of Plaintiff.

The Magistrate Judge recommended reversal and remand, finding the ALJ erred in not following the procedure set forth by SSR 00–4p when the ALJ did not obtain a reasonable explanation for a conflict between the vocational expert testimony and the *Dictionary of Occupational Titles* (DOT).[53] The Magistrate Judge found no error on Plaintiff's second and third arguments, but stated the ALJ should consider the new psychological report on remand.[54]

## D. Objections

The Commissioner objects to the remand of the case.[55] The Commissioner asserts that the ALJ's determination that Plaintiff can work as a school bus monitor is unaffected by the ALJ's failure to follow SSR 00–4p. The Commissioner contends that the Court can affirm the Commissioner's decision because the school bus monitor job alone is available in significant numbers in the national economy; therefore substantial evidence exists for the District Court to affirm the ALJ's decision under step five.[56]

Plaintiff responds that, because the ALJ's "significant number" decision was based on a finding that Plaintiff could work any of four different jobs (night watchman, security guard, gate guard, and school bus monitor), any decision by the Court regarding whether the school bus monitor job alone satisfies the "significant number" standard would constitute an im-

47. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

48. *Id.* at 29–30.

49. *Id.* at 26.

50. *Id.* at 29–30.

51. Docket # 23 at 27.

52. Tr. at 5, 10–11.

53. Docket # 23 at 28–29.

54. Docket # 21 at 35.

55. Docket # 23 at 5.

56. *Id.* at 5.

proper post hoc rationalization for affirming the decision of the Commissioner.[57] Plaintiff further argues that the Court should reject the Magistrate Judge's recommendation that Plaintiff could work as a school bus monitor.

### E. Analysis

1. **Whether the ALJ erred in failing to comply with SSR 00–4p in considering the security guard, gate guard, and night watchman positions**

"When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will: Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and if the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict." [58] Plaintiff argues that the Magistrate Judge failed to comply with SSR00–4p in considering the VE's testimony that Plaintiff could work as a security guard, gate guard, night watchman, or school bus monitor. The Magistrate Judge concluded that the ALJ failed to comply with SSR 00–4p with respect to his inquiries regarding the security guard, gate guard, and night watchman positions, but that the ALJ did not so err in his consideration of the school bus monitor position. Neither party takes issue with the Magistrate Judge's conclusion regarding the security guard, gate guard, and night watchman positions. Therefore, the Court reviews this portion of the Magistrate Judge's determination to ensure it is neither clearly erroneous nor contrary to law.[59]

The VE classified each of the three jobs as unskilled labor.[60] The DOT classifies these three jobs each as having a special vocational preparation factor ("SVP") of 3.[61] SSR 00–4p states unskilled work corresponds to a SVP of 1–2 and semi-skilled work corresponds to a SVP of 3–4.[62] The DOT classifies the jobs of night watchman, security guard, and gate guard as semi-skilled work. An apparent conflict thus exists between the DOT and the VE's testimony as to the skill level required for each job. Likewise, a possible conflict exists between the VE's testimony that Plaintiff could work as a night watchman, gate guard, or security guard, despite having very limited use of one arm, and the DOT, which states that each job requires occasional to frequent reaching and handling. The ALJ did not articulate or attempt to elicit a reasonable explanation for the conflicts. Nor did the VE testify regarding any such apparent conflicts. Therefore, the Magistrate Judge's conclusion that the ALJ failed to comply with SSR 00–4p is neither clearly erroneous nor contrary to law. On remand, the ALJ is instructed to conduct proceedings in compliance with SSR 00–4p in determining whether Plaintiff could work as a night watchman, security guard, and gate guard.

**57.** Docket # 24 at 2–3.

**58.** SSR 00–4p, 2000 WL 1898704, at *4 (S.S.A. Dec. 4, 2000).

**59.** *United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir.), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989).

**60.** Tr. at 30.

**61.** DICTIONARY OF OCCUPATIONAL TITLES, at appx. C (1991), available at www.westlaw.com (Database DICOT).

**62.** SSR 00–4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).

## 2. Whether the ALJ erred by concluding at step five that Plaintiff could work as a school bus monitor

Plaintiff argues that the ALJ improperly considered at step five whether Plaintiff could work as a school bus monitor because: (a) the ALJ failed to comply with SSR 00–4p in considering the position, and (b) Plaintiff claims the position is only available as part-time work and that part-time work should not be considered at step five.[63]

### a. SSR 00–4p

Plaintiff argues that the VE's conclusion that Plaintiff could work as a school bus monitor, despite Plaintiff's very limited use of one arm, conflicts with the DOT regarding the use of arms in that the DOT does not include any information about jobs compatible with full use of one arm and very limited use of the other. Therefore, Plaintiff argues that a conflict existed between the VE's testimony and the DOT such that the ALJ should have followed the procedure set forth by SSR 00–4p. The Magistrate Judge concluded that Plaintiff failed to present evidence that the VE's testimony was inconsistent with the DOT specifications for the school bus monitor position; therefore, the ALJ did not fail to comply with SSR 00–4p.[64] Plaintiff objects to the Magistrate Judge's conclusion.[65] The Court therefore reviews Plaintiff's arguments *de novo*.[66]

■ Substantial evidence supports the ALJ's implicit conclusion that the VE's testimony does not conflict with the DOT.

The DOT describes a monitor's duties as follows:

> Monitors conduct of students on school bus to maintain discipline and safety: Directs loading of students on bus to prevent congestion and unsafe conditions. Rides school bus to prevent altercations between students and damage to bus. Participates in school bus safety drills. May disembark from school bus at railroad crossings and clear bus across tracks.[67]

Plaintiff argues that prevention of altercations between students requires that a monitor have the full use of both arms. Plaintiff ignores that this duty is modified by the phrase "[r]ides school bus to" prevent altercations. The phrase implies that the monitor's mere presence is intended to prevent altercations. Confirming this reading, the DOT further explains that a school bus monitor is not required to reach, handle, crawl, climb, or feel.[68] Because no apparent conflict exists between the DOT and the VE's testimony, the ALJ did not err by failing to follow SSR 00–4p with respect to the school bus monitor position.

### b. Part-time work

The Magistrate Judge concluded that substantial evidence supports the ALJ's decision that school bus monitors typically work full time,[69] and therefore it was proper for the ALJ to consider the position at step five.[70] Neither party challenges the Magistrate Judge's conclusion, so the Court reviews whether the finding is clearly erroneous or contrary to law.

---

**63.** Docket # 11 at 9–10.

**64.** Docket # 21 at 28–30.

**65.** Docket # 24 at 4–7.

**66.** Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1).

**67.** Dictionary of Occupational Titles, at appx. C (1991), available at www.westlaw.com (Database DICOT).

**68.** *Id.*

**69.** Docket # 21 at 31.

**70.** *See* SSR 96–8p, available at http://www.ssa.gov/OP_Home/rulings/di/01/SSR96–08–di–01.html ("Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work

■ The Magistrate Judge based her decision on the following points: (1) neither the description in the DOT for school bus monitor nor the VE's testimony suggest the work is performed on a part-time basis; (2) the VE testified during the hearing that light exertion work included "standing up to six to eight hours in a workday," described the work of school bus monitor as light exertion work according to the DOT, and opined that plaintiff would be capable of performing such work; and (3) no evidence existed to the contrary. The cited testimony regarding light exertion work was not intended to comment on whether a school bus monitor typically works a part-time job; rather, the VE was merely setting the maximum parameter of exertion for each of the jobs under consideration:

ALJ: Have you reviewed the evidence in this case?

VE: I have.

ALJ: Been present and heard the testimony?

VE: I have.

ALJ: Would you give us your understanding of the classifications of work activity so far as strength demands are concerned?

VE: Yes. We're talking sedentary when we mean up to—sitting up to six to eight hours and occasionally lifting up to 10 pounds. When we speak of

light, we're speaking of standing up to six to eight hours in a workday and lifting occasionally 10 pounds and frequently—occasionally 20 pounds and frequently 10 pounds. And medium is occasionally lifting 50 pounds and frequently lifting 25.[71]

This is not evidence suggesting that school-bus monitors work full-time. No evidence was presented suggesting that school bus monitors typically work full time. Therefore, substantial evidence does not support the ALJ's decision, and the Magistrate Judge's conclusion was clearly erroneous.[72] On remand, the ALJ is instructed to conduct further factual development regarding whether and the extent to which the job of school bus monitor is available as a full-time position in the national and local economies.

### 3. Whether the ALJ should have ordered a consultative psychological examination

Plaintiff argues in his appeal brief that the ALJ should have granted his request for a consultative psychological examination. During the administrative hearing, Plaintiff's attorney requested "a consultative examination" to examine Plaintiff's mental acumen and alleged functional illiteracy, in the event the ALJ did not find Plaintiff disabled based on the evidence in the record at the time of the hearing.[73] The ALJ denied Plaintiff's request.

schedule."); *but see id.* at n. 2 ("The ability to work 8 hours a day for 5 days a week is not always required when evaluating an individual's ability to do past relevant work at step 4 of the sequential evaluation process. Part-time work that was substantial gainful activity, performed within the past 15 years, and lasted long enough for the person to learn to do it constitutes past relevant work, and an individual who retains the RFC to perform such work must be found not disabled.").

71. Tr. at 222–23.

72. The Commissioner contends that the ALJ's decision at step five must be affirmed because substantial evidence exists in the record that the school-bus monitor job alone exists in significant numbers in the national economy. This argument depends on the Court's acceptance of the Magistrate Judge's recommendation that the school bus monitor job should be considered at step five. Because the Court does not accept that recommendation, the Commissioner's argument is rendered moot.

73. Tr. at 296, 231; *see also id.* at 297 (Plaintiff's attorney stating: "So I think it would be

The regulations provide that "[a] consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim." [74] The Magistrate Judge found that substantial evidence supported the ALJ's decision not to order a consultative examination. Plaintiff testified that he completed seventh grade but dropped out of eighth grade. Plaintiff alleged that he has difficulties in reading and writing, and a Social Security Administration representative's notes indicate that Plaintiff has problems writing, is illiterate, and probably has low mental functioning. Nonetheless, Plaintiff stated that he can read small words, that he was in regular, not special education classes, and that he dropped out of school not due to learning difficulties but because he was being bullied. Plaintiff further testified that he signed his disability application. The field representative who conducted a face-to-face interview with Plaintiff observed Plaintiff to have no difficulty in reading, writing, understanding, or concentrating during the interview. Plaintiff holds a driver's license, suggesting that his reading and writing abilities are sufficient enough to have read and passed the Texas driver's certification test. There was significant evidence available from which the ALJ could make a decision regarding Plaintiff's claim. Neither party objected to the Magistrate Judge's conclusion, and the Court accepts the Magistrate Judge's recommendation as neither clearly erroneous nor contrary to law.

### 4. Whether the ALJ should consider Plaintiff's new medical report on remand

On appeal, Plaintiff submitted to the Court a March 2008 report of a psychological evaluation of Plaintiff, which purports "to establish current levels of intellectual, adaptive, academic, and psychological functioning." [75] The report, which was completed after this appeal was filed, was not presented to the ALJ. Plaintiff requests that the ALJ remand this case with instructions to consider the newly submitted evidence.

■ The Court may "order additional evidence to be taken ... upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." [76] The Magistrate Judge recommended that the ALJ be instructed to consider "the relevance of and the weight to give the report, if any, as well as wether it might be necessary to seek a consultative psychological evaluation at this time." [77]

The Commissioner addressed the recommendation in one sentence in his objections, stating: "Finally, given that the Magistrate Judge's remand recommendation for consideration of Plaintiff's additional consultative report was clearly contingent on the unnecessary remand for further development of the vocational evidence, the entirety of the Commissioner's final decision should be affirmed." [78] The Court has concluded that remand is appropriate, therefore the Commissioner's argument is inapplicable.

extremely important to determine whether or not, in fact, what his reading and writing abilities are and what his cognitive deficits are, if any.'').

**74.** 20 C.F.R. §§ 404.1519a(b) and 416.919a(b).

**75.** Docket # 11, Ex. A at 1.

**76.** 42 U.S.C. § 405(g).

**77.** Docket # 21 at 35.

**78.** Docket # 23 at 6–7.

■ Because the Court is remanding this case for further factual development on other grounds, and because the Commissioner objected to the Magistrate Judge's conclusion only in the event that the Court found remand otherwise inappropriate, the Court accepts the Magistrate Judge's recommendation. On remand, the ALJ shall consider the relevance of and the weight to give the report, if any, as well as whether it might be necessary to seek a consultative psychological evaluation at this time.

### Conclusion

For the foregoing reasons, the recommendation of the Magistrate Judge is accepted, and the decision of the Commissioner is REVERSED and REMANDED. On remand, the ALJ is instructed to: (1) conduct proceedings in compliance with SSR 00–4p in determining whether Plaintiff could work as a night watchman, security guard, and gate guard; (2) conduct further factual development regarding whether and the extent to which the job of school bus monitor is available as a full-time position in the national and local economies; and (3) consider the relevance of and the weight to give the report, if any, as well as whether it might be necessary to seek a consultative psychological evaluation at this time.

It is so ORDERED.

### REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

PAMELA A. MATHY, United States Magistrate Judge.

**TO: Xavier Rodriguez**

**United States District Judge**

Pursuant to the informal referral in the above-styled and numbered cause of action to the undersigned United States Magistrate Judge and consistent with the authority vested in United States Magistrate Judges under the provisions of 28 U.S.C. Section 636(b)(1)(B) and Rule 1(d) and (h) of the Local Rules for the Assignment of Duties to United States Magistrate Judges in the Western District of Texas, the following report is submitted for your review and consideration.

### I. JURISDICTION

The Court has jurisdiction under 42 U.S.C. Sections 405(g) and 1383(c)(3).

### II. PROCEDURAL HISTORY

This is an action to review a decision of the Commissioner of Health and Human Services under Section 205(g) of the Social Security Act, 42 U.S.C. Section 405(g). Ernest Huizar initiated this action pursuant to 42 U.S.C. Section 405(g) seeking review of the determination of Michael J. Astrue, the Commissioner of the Social Security Administration ("SSA"), that plaintiff is not disabled and not entitled to receive disability insurance benefits or supplemental security income benefits.

Plaintiff protectively filed applications for disability insurance benefits and supplemental security benefits on May 18, 2005, alleging disability since May 30, 2003.[1] The Social Security Administration denied benefits initially on August 10, 2005, and upon reconsideration on December 2, 2005.[2] On June 20, 2007, an administrative law judge ("ALJ") held a hearing, at which plaintiff was represented by an attorney.[3] The ALJ issued a written decision on August 17, 2007, denying benefits on the ground that plaintiff was not disabled under the Act.[4] On December 11,

---

1. Transcript at 23, 90–94.

2. *Id.* at 23, 42–50, 53–57.

3. *Id.* at 193–232.

4. *Id.* at 23–31.

2007, the Appeals Council concluded that no basis existed to grant review of the ALJ's decision, and the ALJ's determination became the final decision of the Commissioner.[5] Plaintiff now appeals that determination.

### III. ISSUES

1. Whether substantial evidence supports the Administrative Law Judge's decision that plaintiff was not disabled under the Social Security Act.
2. Whether the decision comports with relevant legal standards.

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision denying disability or supplemental security income benefits, the Court is limited to a determination of whether the decision is supported by substantial evidence and whether the Commissioner applied the proper legal standards in evaluating the evidence.[6] Substantial evidence is more than a scintilla, less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[7] It must do more than create a suspicion of the existence of the fact to be established, but "no substantial evidence" will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence.[8]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[9] "The court does not re-weigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."[10] Conflicts in the evidence are for the Commissioner to resolve.[11] Four elements of proof are weighed in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[12]

### V. ALJ'S FINDINGS AND PLAINTIFF'S CONTENTIONS

At hearing, plaintiff, through counsel, amended the alleged disability onset date to May 30, 2005.[13] The ALJ found that on the disability onset date, plaintiff was a thirty-nine year old male,[14] with a marginal seventh grade education[15] and past work in construction.[16] The ALJ found plaintiff's earnings record showed he had acquired sufficient quarters of coverage to remain insured through December 31, 2010, and had to establish disability on or before that date in order to be entitled to disability insurance benefits.[17]

5. *Id.* at 4–6.

6. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

7. *Id.*

8. *Abshire v. Bowen,* 848 F.2d 638, 640 (5th Cir.1988).

9. *Martinez v. Chater,* 64 F.3d 172, 173 (5th Cir.1995).

10. *Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir.2000).

11. *Id.*

12. *Martinez,* 64 F.3d at 174.

13. Transcript at 23.

14. *Id.* at 29.

15. *Id.* at 25A, 29.

16. *Id.* at 29.

17. *Id.* at 24.

The Social Security Administration has established a sequential five-step test to determine whether an individual has a compensable disability.[18] At the first step, the ALJ found plaintiff had not engaged in substantial gainful employment since May 30, 2005, the alleged onset date.[19] Citing 20 C.F.R. §§ 404.1520(c) and 416.920(c) as well as *Stone v. Heckler,*[20] the ALJ found at the second step that plaintiff had the medically determinable impairment of right hand ulnar nerve palsy, an impairment that is "severe" within the meaning of the Regulations.[21] In addition, the ALJ considered plaintiff's alleged impairments of diminished mental capacity, illiteracy, and depression, finding these alleged impairments to be "nonsevere."[22]

In making the nonseverity determination at step two, the ALJ considered that plaintiff's counsel requested a consultative psychological evaluation to determine whether plaintiff was functionally illiterate, ascertain his level of intellectual functioning, and assess whether a mental impairment, such as depression, was present.[23] In support of the request, counsel cited plaintiff's seventh grade education, his alleged grades in school of 60s and 70s, and his alleged current difficulty with reading and writing.[24] Counsel also cited a Social Security Administration representative's notes indicating probable low functioning as well as plaintiff's allegations of illiteracy and writing difficulty.[25] The ALJ considered plaintiff's testimony that he might have failed the fifth grade, could only read small words, had problems with writing, and was forgetful.[26] Plaintiff admitted he was in regular education classes and was taken out of school by his parents in seventh grade due to bullying not because of learning difficulties.[27] The ALJ found plaintiff told the field representative he was never in special education.[28] Plaintiff testified that his signature was on a disability application dated July 10, 2005, and the ALJ noted in a face-to-face interview with plaintiff, the field representative observed him to have no difficulty in reading, writing, understanding, or concentrating, despite his claim of difficulty with reading.[29] Plaintiff told the field representative that he was unable to write because of hand problems, which the ALJ noted arose from his physical impairment.[30] ALJ found plaintiff held a Texas driver's license, last renewed on September 25, 2000, suggesting his reading and writing abilities were significant enough to enable plaintiff to pass the driver's test.[31]

The ALJ considered the medical expert's testimony that nothing in the medical record indicated the presence of a mental impairment.[32] The medical expert noted plaintiff had never seen a psychia-

---

**18.** 20 C.F.R. §§ 404.1520(b-f) and 416.920(b-f).

**19.** Transcript at 25.

**20.** 752 F.2d 1099 (5th Cir.1985).

**21.** Transcript at 25A (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c) and *Stone v. Heckler,* 752 F.2d 1099 (5th Cir.1985)).

**22.** *Id.* at 26.

**23.** *Id.* at 25 A (citing transcript at 78–86, 111, 123–128, 137–142, 172).

**24.** *Id.*

**25.** *Id.*

**26.** *Id.*

**27.** *Id.*

**28.** *Id.* (citing transcript at 129).

**29.** *Id.*

**30.** *Id.* (citing transcript at 109–112).

**31.** *Id.* (citing transcript at 79).

**32.** *Id.* at 25A.

trist, received pharmacological or counseling treatment, or been hospitalized for mental problems.[33] The ALJ found plaintiff had not reported psychosocial problems during a March 2005 examination by his treating physician, Abimbola Banjo, M.D.[34] Additionally, the ALJ found it noteworthy that plaintiffs disability applications did not include allegations of mental problems even though he reported to a Social Security Administration agent that he was upset and depressed at times because of his inability to work and having to cope with his physical problems.[35] The ALJ concluded that nothing in the record suggested limitations in plaintiff's activities of daily living were attributable to alleged mental problems.[36]

The ALJ considered vocational expert's testimony that plaintiff's past relevant work experience as a roofer/carpenter/painter most closely resembled that of Construction Worker I in the *Dictionary of Occupational Titles* ("DOT"), which is classified as heavy, semiskilled work.[37] The ALJ found plaintiff had engaged in substantial gainful activity for nine or ten years, vitiating plaintiff's claim that his alleged diminished mental capacity, illiteracy, and depression posed obstacles to his ability to perform and sustain work on a competitive basis.[38] As such, plaintiff's alleged mental impairments were not considered to cause any functional restrictions.[39]

Having found plaintiff suffered from a severe impairment, the ALJ found at the third step of the evaluation process that plaintiff did not have an impairment that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.[40] The ALJ gave particular attention to Listing 1.02 and Listing 11.01, respectively musculoskeletal neurological impairments, but found the medical evidence did not document the specific criteria required to satisfy the listings.[41]

Because the ALJ determined plaintiff suffered from severe impairments that did not meet or equal listed impairments, the ALJ considered at step four of the evaluation process whether plaintiff retained the residual functional capacity ("RFC") to perform his past relevant work or other work available in the national economy.[42] The ALJ explained the term "residual functional capacity" is an individual's "ability to do physical and mental work activities on a sustained basis despite limitations from his impairments."[43] Citing 20 C.F.R. §§ 404.1527, 404.1529, 416.927, and 416.929 as well as SSRs 96–2p, 96–4p, 96–5p, 96–6p, 96–7p and 06–3p, the ALJ noted the assessment at step four was based on consideration of plaintiffs symptoms, objective medical evidence, and opinion evidence.[44]

Based on consideration of the entire record, the ALJ found plaintiff had the RFC to perform unskilled,[45] light exertion work

33. *Id.*

34. *Id.* (citing transcript at 155).

35. *Id.* (citing transcript at 125).

36. *Id.* (citing transcript 129).

37. *Id.* at 25A.

38. *Id.*

39. *Id.* at 25A–26 (citing transcript at 96).

40. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

41. *Id.* at 26.

42. *Id.*

43. *Id.* at 25 (citing 20 C.F.R §§ 404.1520(e), 404.1545, 416.920(e), and 416.945, as well as SSR 96–8p).

44. *Id.* at 26.

45. *Id.* at 30.

and had full use of the left upper extremity but was limited to using his right arm as a helper hand, although he retained the capacity to sign his name with the right upper extremity.[46] In making this determination, the ALJ considered plaintiff's testimony that he was born in September 1965, was never married, lived with a roommate in a house, and had no source of income but received financial help from the roommate and his sister.[47] According to plaintiff's testimony, the roommate is disabled and receives a disability check.[48] Plaintiff also testified that he: finished the seventh grade; learned construction work from his father; did roofing; and was a carpenter's helper and a contractor, sometimes with a helper.[49] Plaintiff clarified that his carpentry work included putting up rafters on houses as well as picking up frames, 2x4s, and doors but not building cabinets.[50] Plaintiff earned eight to nine dollars an hour.[51] Plaintiff claimed his hand was injured in August 2003, but he continued working and had worked intermittently since May 30, 2005.[52] Plaintiff testified that he ate two meals a day, slept four to six hours a day, had difficulty attending to his personal needs, and mowed yards with a power push mower to earn some money, but with difficulty due to the right arm impairment.[53] Plaintiff: did not grocery shop; attended church once a month, where he was given groceries; had a Texas driver's license, but had not operated a vehicle in a few years; was driven to the hearing by a friend; and occasionally watched television, looked at pictures in a magazine, or walked approximately one mile at a time.[54] Plaintiff testified to being right-hand dominant, and although his left arm, elbow, and hand ached, he could make a fist and button very slowly with that arm.[55] The ALJ noted plaintiff demonstrated his inability to close the fingers on his right hand.[56] Plaintiff further testified that he had never been seen by a psychiatrist or hospitalized for mental reasons.[57] Plaintiff's testimony reflects he had attended regular education classes, earned grades of 60 and 70, believed he repeated fifth grade, was ultimately kept out of school by his parents because of bullying, can read only small words, has difficulty writing, and became forgetful after he was struck by a truck.[58] Plaintiff testified that he took medications for his hand but felt constant tingling and pain.[59]

From the evidence of record, the ALJ found plaintiff's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms and limitations, but that plaintiff's statements concerning the alleged intensity, persistence, and limiting effects of the symptoms were not entirely credible.[60] The ALJ found the record revealed that one night in May 2003, plaintiff was walk-

46. *Id.* at 26.

47. *Id.* at 27.

48. *Id.*

49. *Id.*

50. *Id.*

51. *Id.*

52. *Id.*

53. *Id.*

54. *Id.*

55. *Id.*

56. *Id.*

57. *Id.*

58. *Id.*

59. *Id.*

60. *Id.* at 27–28.

ing on a road while he was intoxicated and was struck by the rear view mirror of a passing truck.[61] Plaintiff sustained an apparent significant injury to his right side, with mention of some left-side problems that were not key to plaintiff's alleged disability.[62] Plaintiff was struck on the right arm, hand, or elbow, but x-rays were negative for fracture.[63] The injury was to the right ulnar nerve, and plaintiff eventually lost nerve function, developing claw-finger deformity.[64] A September 2005 EMG study reflected: severe, longstanding right-side neuropathy of questionable etiology; significant denervation in the ulnar distributed muscles, especially in the hand; and findings compatible with moderately severe carpal tunnel syndrome on the right side with evidence of minimal denervation distal to the entrapment.[65] The medical records indicated plaintiff complained of ongoing pain, loss of feeling, tingling sensations, and inability to make a good grip.[66] Progressive right-hand atrophy with decreasing strength and functioning were observed.[67]

The ALJ considered records showing plaintiff had been treated for pain with Lortab and Soma and for sleep with Lunesta.[68] But, other than the initial emergency room treatment after the accident,[69] the ALJ found plaintiff had not been in therapy or seen by a pain management specialist.[70] The ALJ also found the record contained little mention of pain other than as reflected on plaintiff's medication list and by a complaint of sleep difficulty,[71] The ALJ considered records showing plaintiff's treating physician, Dr. Fred Corley, M.D., had suggested tendon transfers to correct the fourth and fifth digits and to help with clawing, but plaintiff declined.[72] In January 2007, Dr. Corley, observed plaintiff was not in acute distress and had a "typical deformity in the right hand from an ulnar nerve injury," with wasting in the first dorsal interosseous and decreased sensation in the ring and little fingers.[73] Dr. Corley again discussed the benefits of tendon transfers to improve functionality, and plaintiff appeared to agree to surgery in March 2007.[74] But, the ALJ noted that at the June 2007 hearing, plaintiff continued to exhibit claw deformity, suggesting the surgery had not been performed.[75]

The ALJ next considered the medical expert's testimony that the record indicated plaintiff's only significant injury was to his right ulnar nerve.[76] The medical expert testified plaintiff had developed problems with the right hand, including loss of nerve function and atrophy, which resulted in claw deformity and a minimally useful hand.[77] The medical expert also testified that: plaintiff's hand could be used as a

---

**61.** *Id.* at 28 (citing transcript at 163).

**62.** *Id.*

**63.** *Id.* (citing transcript at 164).

**64.** *Id.*

**65.** *Id.* (citing transcript at 172–74).

**66.** *Id.* (citing transcript at 155, 178, 180, 181, and 182).

**67.** *Id.*

**68.** *Id.* (citing transcript at 191).

**69.** *Id.* (citing transcript at 161).

**70.** *Id.* at 28.

**71.** *Id.* (citing transcript at 155 and 161).

**72.** *Id.* (citing transcript at 177).

**73.** *Id.*

**74.** *Id.*

**75.** *Id.* at 28.

**76.** *Id.*

**77.** *Id.*

helper hand for guiding and steadying; the record reflected little mention of pain, but plaintiff had testified to pain; Dr. Corley had prescribed pain medications; and the record did not indicate mental impairments.[78] The ALJ found the testimony and opinions of the medical expert credible and persuasive.[79]

From the opinion evidence, the ALJ found that on June 19, 2007, Dr. Banjo assessed plaintiff with constant limited use of his right hand for fine and gross manipulation, with occasional similar limitation in the left hand.[80] Dr. Banjo also reported severe pain and stated there was "evidence of limitation of activity of daily living and gainful employment at this time."[81] Although the record revealed actual treatment visits had been infrequent, the ALJ acknowledged Dr. Banjo had a "treating relationship" with plaintiff.[82] Nevertheless, the ALJ found Dr. Banjo's opinion regarding the plaintiff's left hand function was "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion since the medical records, sparse as they are, concentrate on the claimant's right hand problems."[83] The ALJ noted Dr. Banjo's opinion that plaintiff was disabled, and found it was not clear the doctor was familiar with the definition of disability stated in the Social Security Act and the regulations.[84] The ALJ found Dr. Banjo's reference to evidence of limitations in daily activity, was not supported by further elaboration.[85]

The ALJ found plaintiff had worked after the alleged onset date, though he had not engaged in disqualifying substantial gainful activity, indicating plaintiff's daily activities had been somewhat greater than he reported.[86] The ALJ concluded plaintiffs daily activities of walking, attempting to do house chores, trying to cook, and going to the movies were not limiting to the extent one would expect, given the complaints of disabling symptoms and limitations.[87]

The ALJ considered the vocational expert's testimony that plaintiff had past relevant work as a construction worker I, classified by the DOT as heavy, semiskilled work.[88] The ALJ concurred with the vocational expert's opinion that plaintiff's RFC would preclude him from performing such work.[89] The ALJ then considered at step five whether plaintiff would be capable of performing other work substantially available in the national economy. The ALJ explained that, at step five, plaintiff's "[RFC], age, education, and work experience" must be considered "in conjunction with the Medical–Vocational Guidelines," which are used as a "framework" for the decision "[w]hen the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has any nonexertional limitations."[90]

The ALJ found that at thirty-nine years of age on the onset date of May 30, 2005, plaintiff was defined as a younger individu-

78. *Id.*

79. *Id.*

80. *Id.* at 29 (citing transcript at 192).

81. *Id.*

82. *Id.* at 29.

83. *Id.*

84. *Id.*

85. *Id.*

86. *Id.*

87. *Id.*

88. *Id.*

89. *Id.*

90. *Id.* at 30.

al who had a marginal education and was able to communicate in English.[91] The ALJ concluded transferability of job skills was not an issue because the Medical–Vocational Rules supported a finding that plaintiff was "not disabled," whether or not he had transferable job skills.[92] The ALJ found that if plaintiff were able to perform a full range of light work, a finding of "not disabled" would be directed by Medical–Vocational Rules 202.18.[93] Because plaintiff's ability to work was impeded by additional limitations, the ALJ considered the testimony of a vocation expert on whether a significant number of jobs existed in the national economy for plaintiff to perform.[94] Given a person with plaintiffs characteristics and RFC with restrictions, the vocational expert testified such an individual would be capable of performing the requirements of "representative occupations at the light, unskilled level with the arm/hand limitations indicated" as night watchman, gate guard, security guard, and school bus monitor, each of which were available in significant numbers in the national economy.[95] The ALJ noted a: night watchman had no duties but to be present at the site, was instructed to leave the site upon observing a commotion and report to supervisor, was not required to write reports, and could be illiterate or non-English speaking; gate guard watches trucks enter and leave, particularly in industrial sector; security guard checks the identifications of people entering and exiting a site; and school bus monitor rides the bus to monitor entry and exit from the bus.[96] The ALJ stated that pursuant to SSR 00–4p, the vocational expert's testimony was consistent with the information contained in the DOT.[97]

The ALJ accepted the vocational expert's testimony and concluded plaintiff had the RFC for work found in significant numbers in the economy.[98] Accordingly, the ALJ found plaintiff was not under a "disability" as defined in the Social Security Act from May 30, 2005, through the date of the ALJ's decision.[99]

On May 21, 2008, plaintiff filed a brief opposing the Commissioner's decision.[100] Plaintiff asks the Court to "enter judgment under sentence four of 42 U.S.C. § 405(g), reversing the Commissioner's final decision with a remand for rehearing, i.e., for further administrative proceedings" based on three harmful errors.[101] Alternatively, plaintiff asks the Court to remand under sentence six of § 405(g) for consideration of exhibit A, which is attached to plaintiffs brief. Plaintiff argues, in sum, that the ALJ's decision is not supported by substantial evidence and does not comport with the relevant legal standards.[102] Specifically, plaintiff claims the ALJ: (1) did not comply with SSR 00–4p, making multiple harmful errors regarding conflicts between the vocational expert's testimony and the DOT; (2) failed to recognize that school bus monitors work part-time; and (3) failed to order a consultative psychological examination.[103]

**91.** *Id.*

**92.** *Id.* (citing 20 C.F.R. Part 404, Subpart P, Appendix 2 and SSR 82–41).

**93.** *Id.*

**94.** *Id.*

**95.** *Id.*

**96.** *Id.*

**97.** *Id.*

**98.** *Id.*

**99.** *Id.* (citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

**100.** Docket no. 11.

**101.** *Id.* at 17.

**102.** *Id.* at 5–17.

**103.** *Id.*

On July 1, 2008, the Commissioner filed a responsive brief, arguing, in sum, that the ALJ's decision is supported by substantial evidence and was decided under the correct legal standards.[104] On July 15, 2008, plaintiff filed a reply brief;[105] the Commissioner filed a sur-reply on July 18, 2008;[106] and plaintiff filed a response on August 6, 2008.[107] The parties arguments are discussed below.

## VI. ARGUMENTS AND CONCLUSIONS OF LAW

In this section the Court will discuss in greater detail the applicable legal standards before applying those standards to plaintiff's specific claims as raised in his brief.

### A. Entitlement to Benefits

Every individual who is insured for disability insurance benefits, has not attained retirement age, has filed an application for benefits, and is under a disability is entitled to receive disability insurance benefits.[108] Each aged, blind or disabled individual who meets certain income and resources limitations is entitled to receive supplemental security income.[109] The term "disabled" or "disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be ex-

pected to last for a continuous period of not less than 12 months.[110] A person shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.[111]

### B. Evaluation Process and Burden of Proof

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[112] A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.[113] The first step involves determining whether the claimant is currently engaged in substantial gainful activity. If so, the claimant will be found not disabled regardless of his medical condition or his age, education, and work experience. The second step involves determining whether the claimant's impairment is severe. If it is not severe, the claimant is deemed not disabled. In the third step, the Commissioner compares the severe

---

**104.** Docket no. 18.

**105.** Docket no. 19.

**106.** *See* docket no. 17, Order granting Commissioner's motion for leave to file "response" and docket no. 16, attachment. Based on the order in which the parties have filed their pleadings, the Commissioner's pleading is more accurately denominated a sur-reply and plaintiff's subsequent pleading a sur-reply response.

**107.** Docket no. 20.

**108.** 42 U.S.C. § 423(a)(1) (1995).

**109.** 42 U.S.C. § 1382(a).

**110.** 42 U.S.C. § 1382c(a)(3)(A).

**111.** 42 U.S.C. § 1382c(a)(3)(B).

**112.** 20 C.F.R. §§ 404.1520 and 416.920.

**113.** *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir.1995).

impairment with those on a list of specific impairments. If it meets or equals a listed impairment, the claimant is deemed disabled without considering his age, education, and work experience. If the impairment is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional capacity and the demands of his past work. If he can still do this kind of work, he is not disabled. If he cannot perform his past work, the Commissioner moves to the fifth and final step of evaluating the claimant's ability, given his residual capacities and his age, education, and work experience, to do other work. If he cannot do other work, he will be found to be disabled. The claimant bears the burden of proof at the first four steps of the sequential analysis.[114] Once he has shown that he is unable to perform his previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that claimant is capable of performing.[115] If the Commissioner adequately points to potential alternative employment, the burden then shifts back to the claimant to prove that he is unable to perform the alternative work.[116]

## C. Plaintiffs Claims In Appealing The ALJ's Decision:

### 1. Whether the ALJ failed to comply with SSR 00–4p

#### a. summary of arguments

Plaintiff argues, in sum, that the ALJ's reliance on the vocational expert's testimony at step five is not supported by sub-stantial evidence.[117] Plaintiff asserts the vocational expert's testimony conflicts with the DOT, which plaintiff concedes is important but not binding on the ALJ's decision.[118] Specifically, plaintiff argues the vocational expert's testimony, based on the ALJ's hypothetical question, conflicted with the DOT regarding: the skill level required for work as night watchman, gate guard, and security guard; the use of hands required for all four types of work identified, including school bus monitor; and the possibility of handling student altercations as required of a school bus monitor.[119] Plaintiff contends that contrary to the requirements of SSR 00–4p, the ALJ erred by finding the vocational expert's testimony was consistent with the DOT without first asking if such was true, obtaining an explanation from the vocational expert for the conflict, or discussing the expert's explanation in the decision.[120]

Citing SSR 00–4p, defendant argues, in sum, that the ALJ is required to elicit an explanation for an "apparent unresolved conflict" between the DOT and the vocational expert's testimony, and in this case, there was no such conflict.[121] Defendant contends substantial evidence supports the ALJ's conclusion that the vocational expert's testimony is consistent with the DOT.[122] Defendant asserts the vocational expert, based on personal knowledge, did distinguish the particular occupation he described as night watchman from the general description provided in the DOT for the work.[123] Noting that pursuant to SSR 00–4p, the skill level definitions provided in the Social Security regulations are

---

**114.** *Id.* at 564.

**115.** *Anderson v. Sullivan,* 887 F.2d 630, 632 (5th Cir.1989).

**116.** *Id.* at 632–633.

**117.** Docket no. 11 at 5.

**118.** Docket no. 11 at 6, 8.

**119.** *Id.* at 8–10.

**120.** *Id.* at 6–7.

**121.** Docket no. 14 at 6.

**122.** *Id.*

**123.** *Id.* at 7–8.

controlling, defendant argues the special vocational preparation factor ("SVP") of 3 as specified by the DOT, or semiskilled as defined in the SSR, designated for the occupations of night watchman and guard are not inconsistent with the regulation definition for unskilled work, a characteristic included in the ALJ's hypothetical question.[124] With respect to whether the occupations the vocational expert identified are compatible with plaintiff's full use of his left arm and limited use of the right, defendant argues the Selected Characteristics of Occupations Defined in the Revised DOT ("SCO"), a publication corresponding to the DOT, employs both the singular and plural form of hand and arm, contemplating the use of one arm.[125] As for the possibility of a school bus monitor handling altercations between students, as shown by the DOT to be a requirement of the position, defendant asserts "[c]ommon sense dictates that once an altercation occurs and cannot be broken up with verbal commands or minimal physical intervention, the authorities would be called to the scene."[126]

In reply, plaintiff asserts he has established SSR 00–4p is binding and the "ALJ did not fulfill his 'affirmative responsibility' under" the SSR to determine whether the vocational expert's testimony was consistent with the DOT and obtain a reasonable explanation for any discrepancy.[127] Plaintiff contends he has established a conflict regarding the skill levels of the work the vocational expert identified from the DOT and defendant has "misstated SSR 00–4p's provision regarding SVP," which "makes

an absolute distinction between SVP 1–2 [unskilled] and SVP 3–4 [semiskilled]."[128] Plaintiff argues defendant has relied on the "improper post hoc rationalization," that because the DOT does not specify one or two arms, the work may be performed with one.[129] Plaintiff also argues defendant has relied on the "improper post hoc rationalization," that "a bus monitor does not need to intervene physically between fighting students, but can simply wait for the 'authorities' [to] arrive."[130]

In sur-reply, defendant asserts plaintiff "still fails to understand that there was never an apparent unresolved conflict triggering an affirmative duty on behalf of the ALJ to seek a reasonable explanation from the vocational expert."[131] Defendant argues the statement in the decision that the vocational expert's testimony is consistent with the DOT indicates "the ALJ evaluated the vocational expert's testimony with the DOT, a common vocational reference."[132] Additionally, defendant argues an SVP of 3, defined in the DOT as work that can take over one month and up to three months to learn, is not inconsistent with the regulation's description of "unskilled work" as usually learned in thirty days.[133] With respect to whether the work identified by the vocational expert is compatible with plaintiff's ability to use his arms, defendant asserts the SCO is an acceptable vocational resource that can provide guidance regarding the reaching and handling the work requires, and the DOT specifies the work of a school bus monitor does not require fingering, handling, reaching, or feeling.[134]

**124.** *Id.* at 8–9.

**125.** *Id.* at 9.

**126.** *Id.* at 10.

**127.** Docket no. 15 at 1.

**128.** *Id.* at 2.

**129.** *Id.* at 3.

**130.** *Id.*

**131.** Docket no. 16, attachment at 2.

**132.** *Id.*

**133.** *Id.* at 3–4.

**134.** *Id.* at 4–5.

In response to the sur-reply, plaintiff argues that "[i]f the Commissioner were correct [r]egarding the distinction between unskilled work and SVP [3], a vocational expert's testimony about SVP and the level of work ... could *never* conflict with the DOT because any such conflict would not be a conflict but an exception to the general rule." [135] Plaintiff contends defendant's "post hoc rationalization is also contrary to the Agency's own explanation as to how ALJ's should apply SSR 00–4p in reference to SVP and the DOT." [136] Plaintiff asserts defendant's "litigation position" is contrary to Agency policy "that it is inconsistent with the DOT for a vocational expert to testify that SVP 3 work is unskilled." [137] Assuming the ALJ could accept the testimony that SVP 3 work is unskilled, plaintiff argues "SSR 00–04p requires the ALJ to obtain expressly from the vocational expert a 'reasonable explanation' for such deviation." [138]

### b. analysis

The purpose of SSR 00–4p is to emphasize[ ] that before relying on VE or VS evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by the VEs or VSs and information in the [DOT], including its companion publication the [SCO] ... and [e]xplain in the determination or decision how any conflict that has been identified was resolved.[139]

SSR 00–4p provides that at steps 4 and 5 of the evaluation process, the DOT and the SCO are the primary sources for "information about the requirements of work in the national economy," vocational expert testimony may also be used, and "[o]ccupational information provided by a VE ... generally should be consistent with ... the DOT." [140] Before relying on the vocational expert's testimony to support a disability decision, the ALJ must obtain a "reasonable explanation" from the expert for any "apparent conflict" between the testimony and the DOT.[141]

"At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator *will inquire, on the record,* as to whether or not there is such consistency." [142] When the vocational expert "provides evidence about the requirements of a job or occupation, the adjudicator *has an affirmative responsibility* to ask about any possible conflict." [143] The ALJ *will* ask the vocational expert "if the evidence he or she has provided conflicts with information provided in the DOT." [144] If the evidence appears to conflict, the ALJ *must* determine if the vocational expert can provide a reasonable explanation for the discrepancy and provide a basis for relying on the expert's testimony rather than on the DOT.[145] The DOT provides the

---

135. Docket no. 20 at 1.

136. *Id.* at 2. Plaintiff specifically cites an Agency manual for training ALJs, "Frank Cristaudo, Chief ALJ, et al, *Phrasing Hypothetical Questions to Vocational Experts Training Guide* " at 10–11, 16–17, and states copies of these pages are attached as exhibit C. *Id.* Although note 1 in the sur-reply response quotes the manual at page 12, pages 10–11 and 16–17 are not attached to the sur-reply response.

137. *Id.*

138. *Id.*

139. SSR 00–4p, 2000 WL 1898704, at *1 (Dec. 4, 2000).

140. *Id.* at *2.

141. *Id.*

142. *Id.* (emphasis added).

143. *Id.* at *4 (emphasis added).

144. *Id.* (emphasis added).

145. *Id.* at *2 (must), 4 (will).

"maximum requirements of occupations as generally performed," but the vocational expert "may be able to provide more specific information about jobs or occupations than the DOT."[146] The vocational expert may base an explanation on "other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling."[147] The resolution of any conflict *must be explained* in the ALJ's decision "irrespective of how the conflict was identified."[148]

With respect to the SVP's listed in the DOT, SSR 00–4p states the SVP's are consistent with skill level definitions stated in 20 C.F.R. §§ 404.1567 and 416.967.[149] Specifically, unskilled work corresponds to SVP 1–2; semiskilled work corresponds to SVP 3–4; and skilled work corresponds to SVP 5–9.[150] The DOT provides "[t]he levels of [the SVP] scale are mutually exclusive and do not overlap" and defines the specific SVP levels as:

1—Short demonstration only;

2—Anything beyond short demonstration up to and including 1 month;

3—Over 1 month up to and including 3 months;

4—Over 3 months up to and including 6 months;

5—Over 6 months up to and including 1 year;

6—Over 1 year up to and including 2 years;

7—Over 2 years up to and including 4 years;

8—Over 4 years up to and including 10 years; and

9—Over 10 years.[151]

For the purposes of this case, the regulations define "unskilled work" as:

[W]ork which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.[152]

"Semiskilled work" is defined as:

[W]ork which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks.[153]

---

146. *Id.* at *3.

147. *Id.* at *2.

148. *Id.* at *4 (emphasis added).

149. *Id.* at *3

150. *Id.*

151. DICTIONARY OF OCCUPATIONAL TITLES, at appx. C (1991), available at *www.westlaw.com* (database DICOT).

152. 20 C.F.R. §§ 404.1568(a) and 416.968(a).

153. *Id.* at (b).

### skill level

In this case, the ALJ sought testimony about the availability of work for a hypothetical person who could perform light exertion work at the "unskilled entry level"—or as defined in the regulations, work a person can learn in thirty days—[154] and a person who had full use of the left arm and limited use of the right arm as a helper arm.[155] The vocational expert testified such a hypothetical person could perform the light, unskilled work of a night watchman, gate guard, security guard, and school bus monitor.[156] As relevant to whether the skill level identified is consistent with the DOT, only the vocational expert's testimony regarding the first three occupations is at issue.

The vocational expert identified the relevant DOT numbers as 372.667–034 for night watchman and security guard and 372.667–030 for gate guard.[157] As plaintiff argues, a review of the occupations identified by these DOT numbers shows each, rated at SVP 3, requires more than one month and up to three months of training,[158] and is semiskilled work as defined in SSR 00–4p.[159] The vocational expert did not testify, or indicate in any manner, that he was identifying skill levels different from those specified in the DOT or that the DOT skill levels were greater than that found by the ALJ. More important, the ALJ did not ask if vocational expert's testimony was consistent with the DOT so the expert might have had an opportunity to provide a reasonable explanation for the conflict. Although the vocational expert did testify he had personal experience with

the work of night watchman at the light, unskilled level,[160] without some indication the ALJ knew the skill level was inconsistent with the DOT, the ALJ could have believed, and likely did believe, the expert was merely corroborating the DOT specification for that occupation. Specifically, the ALJ states the vocational expert's testimony is consistent with the DOT [161] without any discussion of the conflict between the expert's testimony that the work is unskilled and the SPV 3 or semiskilled level indicated in the DOT.

In sum, the ALJ did not comply with SSR 00–4p as he failed to: ask the vocational expert if his testimony regarding skill level was consistent with information specified in the DOT, obtain an explanation for any conflict, determine if the explanation was reasonable, and include a discussion of his findings in the decision. This case should be remanded, and the ALJ should fully develop the record on the issue of whether plaintiff is capable of performing the duties of night watchman, security guard, or gate guard at the unskilled level.

### use of hands

Plaintiff argues the vocational expert's testimony, as to all jobs identified, conflicts with information in the DOT regarding use of hands, specifically plaintiffs full use of one arm and very limited use of the other. As plaintiff asserts, the DOT does not specifically "include any information about jobs compatible" with limitations such as those the ALJ assessed for plain-

154. *See* 20 C.F.R. §§ 404.1568(a) and 416.968(a).

155. Transcript at 224.

156. *Id.* at 224–25.

157. *Id.* at 227.

158. DICTIONARY OF OCCUPATIONAL TITLES, at appx. C (1991), available at *www.westlaw.com* (database DICOT).

159. SSR 00–4p, 2000 WL 1898704, at * 3.

160. Transcript at 224.

161. *Id.* at 30.

tiff. But, the job descriptions provided by the DOT for each occupation identified do indicate how significant the use of arms might be for that type of work. For night watchman and security guard, the DOT specifies: handling is not significant; low degree of aptitude ability for finger and manual dexterity; frequent reaching and handling from 1/3 to 2/3 of the time; and no fingering or feeling.[162] The description for gate guard specifies: handling is not significant; a low degree of aptitude ability for finger and manual dexterity; occasional reaching and handling up to 1/3 of the time; and no fingering or feeling.[163] The description for school bus monitor specifies: handling is not significant; a low degree of aptitude for finger and manual dexterity; and no reaching, handling, fingering, or feeling.[164]

As with skill level, the ALJ did not inquire whether the DOT was consistent with the vocational expert's testimony that a person with plaintiffs limitations for the use of his arms could perform the work of a night watchman, security guard, gate guard, and school bus monitor. The DOT descriptions set forth above indicate the occupations of watchman or guard require occasional to frequent reaching and handling. The vocational expert did not testify or indicate in any manner what the DOT specified for use of arms or whether his testimony was consistent with such specifications. Because it is not clear from the record that the vocational expert's testimony regarding use of arms is consistent with the DOT as to the work of night watchman, security guard, and gate guard and the ALJ did not comport with SSR 00–4p in making that determination, the

case should be remanded and the ALJ should fully develop the record as to whether plaintiff is capable of performing these occupations given his limitation.

As for the work of a school bus monitor, plaintiff has failed to present evidence showing the vocational expert's testimony is inconsistent with the DOT specifications for that work. As indicated, the DOT description for school bus monitor, which plaintiff has attached as an exhibit to his brief in opposition, shows the work requires no reaching, handling, fingering, or feeling. Although the DOT states that a school bus monitor "[r]ides school bus to prevent altercations between students," [165] plaintiff's conclusory argument this is "something that would be difficult if not impossible to do with full use of only one arm" [166] is not evidence showing the vocational expert's testimony was inconsistent with the DOT.

**2. Whether the ALJ erred in failing to recognize that school bus monitors work part-time**

Plaintiff asserts substantial evidence does not support the ALJ's step five decision to the extent that it rests on Mr. Huizar's ability to work as a school bus monitor, because such work is "typically" performed part-time.[167] As a claimant who cannot work full-time is disabled at step five as a matter of law, plaintiff contends his ability to perform part-time work is irrelevant at step five.[168] To support his assertion that a school bus monitor "typically" works part-time, plaintiff cited information about school bus drivers from the most recent edition of *Occupational Out-*

---

162. DICTIONARY OF OCCUPATIONAL TITLES, at 372.667–034 (1991), available at *www. westlaw.com* (database DICOT).

163. *Id.* at 372.667–030.

164. *Id.* at 372.667–042.

165. *Id.*

166. Docket no. 11 at 9.

167. Docket no. 11 at 10.

168. *Id.*

*look Handbook*, a publication from the Department of Labor's Bureau of Labor Statistics, which is available online at http://www.bls.gov/oco/ocos242.htm.[169]

Plaintiff does not suggest why the ALJ should have known or assumed[170] at the time of the decision that school bus monitors "typically" work part-time. Neither the description in the DOT for school bus monitor nor the vocational expert's testimony suggest the work is performed on a part-time basis. The vocational expert testified during the hearing that light exertion work included "standing up to six to eight hours in a workday,"[171] described the work of school bus monitor as light exertion work according to the DOT, and opined that plaintiff would be capable of performing such work.[172] With no evidence to the contrary, this is substantial evidence in support of the ALJ's decision.

Plaintiff did cite the *Occupational Outlook Handbook*, a publication the Social Security Administration will take notice of for "reliable job information."[173] But, the reliance on this publication is misplaced. The *Occupational Outlook Handbook* provides that:

> School bus drivers work only when schools are in session. *Many* work 20 hours a week or less, driving one or two routes in the morning and afternoon.

Drivers taking field or athletic trips, or who also have midday kindergarten routes, may work more hours a week.[174] At first glance this information suggests some school bus drivers, and by inference the monitors on those buses, may work twenty hours a week or less, but the passage does not quantify "many," or specify such hours are considered "typical." Moreover, the *Occupational Outlook Handbook* further states:

> Bus drivers held about 653,000 jobs in 2006. *About 34 percent worked part time.* Around 70 percent of all bus drivers were school bus drivers working primarily for school systems or for companies providing school bus services under contract. Most of the remainder worked for private and local government transit systems; some also worked for intercity and charter bus lines.[175]

That thirty-four percent of all bus drivers, most of whom are school bus drivers, work part-time does not show it is "typical" for all school bus monitors to work only part-time.

In sum, plaintiff has not shown the ALJ erred in relying on the vocational expert's testimony that plaintiff would be capable of performing the work as a school bus monitor. But, given that the ALJ found work was available in significant numbers

---

169. *Id.* Initially, defendant asserted "part-time work can constitute substantial gainful activity but later clarified such was true for determinations at steps one and four, not step five where the decision to deny disability was made." Docket no. 14 at 10; docket no. 16, attachment at 3.

170. The Court notes it seems common to see school buses in operation throughout the day from before 6 a.m. to well after 5 p.m. on most school days during the regular school year. It also is not uncommon to see school buses in operation, although in reduced numbers, during the summer months and in relation to after-hours school-related programs and activities throughout the year.

171. Transcript at 222.

172. *Id.* at 224–25.

173. *See* 20 C.F.R. §§ 404.1566(d)(5) and 416.966(d)(5).

174. Docket no. 11 at 10 (citing *http://www.bls. gov/oco/ocos242.htm* ) (emphasis added).

175. *See* Dept. of Labor, Bureau of Labor Statistics, "Occupational Outlook Handbook" @ *http://www.bls.gov/oco/ocos242.htm* (emphasis added).

in the national economy based on testimony regarding four occupations and this report's recommendation to remand for further development of the record as to the three occupations of night watchman, security guard, and gate guard, the decision should also be remanded for consideration of whether work as a school bus monitor alone, as reduced to account for plaintiff's limitation, is sufficient to satisfy the "significant number" standard.

### 3. Whether the ALJ should have ordered a consultative psychological examination

Because the ALJ has a duty to develop an adequate record, plaintiff argues the ALJ has the authority to order a consultative examination.[176] Plaintiff asserts the ALJ failed to fully develop the record because he failed to order a necessary consultative examination to evaluate Mr. Huizar's educational achievement, intelligence, and depression.[177] Plaintiff notes that his attorney repeatedly asked the ALJ to order such an examination.[178] In addition, plaintiff asserts the Court should remand the case to consider the March 2008 report from licensed psychological associate Cilia Stultz, M.S., M.A., and supervising psychologist Arthur Flores, Ph.D., which is attached as exhibit A to plaintiffs brief.[179] Plaintiff asserts the report is new because the record before the ALJ and the Appeals Council did not include any psychological evidence.[180] Plaintiff further asserts the report is material because, it would likely change the outcome if considered.[181] Plaintiff asserts "good cause" for not previously obtaining a consultative examination because he "asked the ALJ to obtain such an examination, the ALJ refused the request, and the examination was 'necessary.' "[182]

■ The regulations provide that "[a] consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim."[183] In the present case, the ALJ considered plaintiff's evidence regarding his education, intellectual functioning, and alleged depression. As the ALJ found, except for plaintiffs unsupported subjective complaints to a Social Security Administration agent, there is nothing in the record to show plaintiff complained of depression to treating physicians or any other health source prior to the ALJ's decision, and there is no evidence to suggest what limitations might be caused by such an impairment. With respect to plaintiff's intellectual functioning, as the ALJ found, the evidence shows plaintiff has a seventh grade education, his parents kept him out of school because he was being bullied, he did not drop out because of learning difficulties, and he was not in special education classes.[184] Although plaintiff claimed he could read only small words, the evidence shows he had obtained a Texas driver's license, suggesting he had sufficient reading and writing ability to pass the written

---

176. Docket no. 11 at 11.

177. *Id.* at 12–15.

178. *Id.* at 11 (citing transcript at 32–33, 73, 78–79, 196).

179. *Id.,* exhibit A. The Court notes the psychological evaluation was performed more than three months after the Appeals Council denied plaintiffs request for review on Dec. 11, 2007.

180. *Id.* at 15–16.

181. *Id.* at 16–17.

182. *Id.* at 17.

183. 20 C.F.R. §§ 404.1519a(b) and 416.919a(b).

184. Transcript at 129, 201, 207, 211.

test for the license.[185] This evidence, or the lack of evidence, substantially supports the ALJ's decision that depression and intellectual functioning were not severe impairments at the time of the disability determination. In assessing plaintiff's RFC, the ALJ included a limitation for plaintiff's alleged poor intellectual functioning by limiting plaintiff to unskilled work. As the evidence substantially supports the decision, the ALJ was not required to seek a consultative psychological evaluation.

Nevertheless, plaintiff has provided for the first time a report from a psychological evaluation performed on March 20, 2008, more than a month after the complaint in this case was filed, "to establish current levels of intellectual, adaptive, academic, and psychological functioning."[186] Although arguable that the report is material to the ALJ's decision and good cause exists for the late submission of the report, on remand, the ALJ should consider the relevance of and the weight to give the report, if any, as well as whether it might be necessary to seek a consultative psychological evaluation at this time.

## VII.  RECOMMENDATION

Because the ALJ's determination, in part, does not comport with relevant legal standards and plaintiff has proffered some new evidence regarding his mental functioning, it is recommended that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings under sentences four and six of 42 U.S.C. § 405(g), as discussed above.

## VIII.  INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO OBJECT/APPEAL

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either: (1) electronic transmittal to all parties represented by an attorney registered as a Filing User with the Clerk of Court pursuant to the Court's Procedural Rules for Electronic Filing in Civil and Criminal Cases; or (2) by certified mail, return receipt requested, to any party not represented by an attorney registered as a Filing User.

As provided in 28 U.S.C. § 636(b)(1) and FED. R. CIV. P. 72(b), any party who desires to object to this Report must **file** with the District Clerk and **serve** on all parties and the Magistrate Judge written Objections to the Report and Recommendation within 10 days after being served with a copy, unless this time period is modified by the District Court. A party filing Objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Report will bar the party from receiving a *de novo* determination by the District Court.[187] Additionally, a party's failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Report will bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[188]

---

**185.**  *Id.* at 206.

**186.**  Docket no. 11, exhibit A at 1.

**187.**  *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 472, 88 L.Ed.2d 435 (1985).

**188.**  *Acuna v. Brown & Root Inc.,* 200 F.3d 335, 340 (5th Cir.2000); *Douglass v. United Serv. Auto. Ass'n.,* 79 F.3d 1415, 1428 (5th Cir.1996).

It is **ORDERED, SIGNED** and **ENTERED** this 13th day of August, 2008.